In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-22-00049-CV
IN THE INTEREST OF K.P. AND Z.S.

On Appeal from the County Court at Law No. 3
Montgomery County, Texas
Trial Cause No. 20-11-13628-CV

**MEMORANDUM OPINION**

Mother and Father appeal the termination of their parental rights to Kyle and Zack.[1],[2] In four issues on appeal, Father argues the evidence is legally and factually insufficient to support the trial court's finding to terminate his parental rights pursuant to sections 161.001(b)(1)(E), (N), and (O) of the Texas Family Code and that termination was in the best interest of his child. Tex. Fam. Code Ann. §

---

[1] Father is the biological father of Kyle, only. Zack's father did not file an appeal. Mother appeals her termination as to both Kyle and Zack.

[2] To protect the identities of the minors, we use pseudonyms to refer to them. *See* Tex. R. App. P. 9.8(b)(2).

1

161.00(b)(1)(E), (N), (O), (2). In six issues on appeal, Mother argues that the trial court's order terminating her parental rights to her children is void because the trial court had lost jurisdiction of the case prior to the judgment. Further, Mother argues the evidence is legally and factually insufficient to support the trial court's finding to terminate her parental rights to her children pursuant to sections 161.001(b)(1)(E), (N), and (O) of the Family Code and that the termination was in her children's best interest. *Id*; 263.401. Finally, Mother challenges the trial court's appointment of the Department of Family and Protective Services (the Department) as the sole managing conservator of her children. After careful review of the record of this case, we affirm.

**Background**

**Pretrial Proceedings**

In November 2020, the Department filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. In its Affidavit in Support of Removal, the Department alleged that on October 19, 2020, Mother arrived at the hospital and appeared to be under the influence of an intoxicant; at that time, she tested positive for amphetamines. She gave birth to Kyle at 36 weeks gestation, and the baby tested positive for

amphetamines.[3] Subsequently, the Department received an intake regarding Mother's neglectful supervision of Kyle. In an interview at the hospital, Mother stated to a Department caseworker that she had not used drugs in a long time, but confirmed she lived in a home where others had been using methamphetamines. Father told the Department caseworker that Mother was not in a good home environment, but stated he would protect the child. The Department put a safety plan in place requiring the parents to submit to drug testing and agree that Mother will not be left alone with Kyle. After the safety plan was put in place but before the child was discharged from the hospital, the Department received a call from a social worker. Kyle was only eating at 50%, was sleeping a lot, had a smaller head than normal, appeared to be suffering from withdrawal symptoms, and testing still showed methamphetamines and amphetamines in his system. As such, he would be remaining in the hospital for observation. The social worker also confirmed to the Department that Mother had not visited Kyle at the hospital in two days. The affidavit also revealed that Kyle's doctor was concerned that Mother lacked

---

[3] "The record does not reflect that the affidavit of removal was offered into evidence at trial or judicially noticed by the trial court. Nevertheless, because it was evidence that could have been considered by the trial court in support of its finding that [the child] was removed based on abuse or neglect . . . we include it for the purpose of providing background and context for this opinion." *In re K.N.D.*, No. 01-12-00584-CV, 2014 WL 3970642, at *2 n.2 (Tex. App.—Houston [1st Dist.] Aug. 14, 2014, no pet.) (mem. op. on reh'g) (citing *In re E.C.R.*, 402 S.W.3d 239, 240–41 (Tex. 2013)).

consistency in her parenting, as she appeared erratic and had not provided reliable information to the doctor. The doctor confirmed that the baby was affected by Mother's drug use. After the Department learned that the parents had not visited or called the hospital since the first of the month, efforts to reach the parents were unsuccessful. On November 6, 2020, the trial court signed an Order for Protection of a Child in an Emergency granting the Department temporary sole managing conservatorship of Kyle, and set a hearing for temporary orders.

On November 19, 2020 the Department filed its First Amended Petition, requesting removal of Zack, Mother's one-year old child, from Mother's custody. In its Affidavit in Support of Removal, the Department alleged that Mother failed to maintain consistent contact or provide reliable contact numbers after signing a safety plan for Kyle. Mother eventually contacted the Department and stated that she was living in a hotel with Zack and Father, but could not provide the hotel information. Eventually, Mother contacted the caseworker, stated she and Father are living in Bryan with Zack and that she and Father work full time. While the parents were at work, Zack was being cared for by Father's mother, who has a medical condition that may affect her ability to care for a small child. The trial court subsequently signed another Order for Protection of a Child in an Emergency and Notice of Hearing giving the Department temporary sole managing conservatorship of Zack.

In January 2021, the trial court signed Temporary Orders granting the Department temporary sole managing conservatorship of Zack and Kyle.

On December 30, 2021, the trial court signed an Order Granting Extension of the deadline for this case. In its order, the trial court granted the extension under section 263.401(b) of the Texas Family Code, finding extraordinary circumstances necessitated the children remaining in temporary conservatorship of the Department. The trial court set the final hearing for December 15, 2021.

**Evidence at Trial**

On December 15, 2021 the trial court held a bench trial in this case. Mother and Father did not appear at trial.

Sherrita Thomas testified that she is an investigator for the Department and that the case was originally assigned to another worker. She testified that the investigation started after receiving reports that Mother gave birth to Kyle, who tested positive at birth for amphetamines. She testified that Mother denied using drugs but admitted that she had been around people who used methamphetamines two weeks before she gave birth. A placement for Kyle that Mother recommended presented some difficulties.

Thomas also spoke to Father at the hospital. Father told Thomas that he knew Mother "made a mistake" by testing positive for drugs, but that he would be there for Mother and Kyle.

5

Rosario Salinas testified she is the Department caseworker, and was assigned to this case in February 2021. As soon as she was assigned, she reached out to Mother and Father and discovered the parents were living out of town in College Station. The children were already placed in foster care. The Department set up virtual visitations with the children once a week. According to Salinas, "[Father] wasn't really on the visits[,] [i]t was mostly [Mother]." Salinas described the services that Mother and Father were required to complete under the family service plan; these services included a parent class, involvement with the Parent Collaboration Group, the alcohol substance abuse assessment, a psychosocial evaluation, random drug screenings, and to providing proof of stable housing and income. She testified that because the parents were living out of town, she could not confirm whether they had a stable home or a steady income. When the parents moved back to Conroe, Salinas was able to contact Mother and Father and restart their services with their office. She testified that Mother and Father completed the Parent Collaboration Group, substance abuse assessment, parenting classes, and psychosocial evaluation. Throughout this case, Mother and Father were not very responsive and did not answer her phone calls. Salinas stated that Mother and Father did not answer her phone calls and would only reply to text messages regarding visitation.

Salinas had concerns about Mother's and Father's substance abuse. She stated that both Mother and Father were required to submit to drug testing at least once a

month, sometimes twice a month. Mother and Father were tested only three times, with the last time at least 5 months before trial. She stated that Mother and Father have not shown that they are not continuing to use illegal substances and she remained concerned for the safety of the children should they be returned to the parents.

Salinas visited Mother and Father's home on October 26, with the children's guardian ad litem. Mother and Father have lived in the home since spring 2021. According to Salinas, no one answered their calls or responded when they arrived at the home. Pictures of the exterior of the home were admitted at trial. Salinas did not believe the house was structurally sound, sanitary, or a "safe environment for the kids." Salinas admitted that she has never observed the interior of the house. She stated that she confirmed with Father prior to her visit that she was coming to visit the house and he stated he would tell Mother. Mother never replied to her message about visiting the home.

Salinas testified that the children are doing "wonderful" in their foster home. She said that at some point both Kyle and Zack were in physical therapy to "strengthen [their] muscle[s]." According to Salinas, Mother and Father were allowed 1 hour per week of in person visitation. Salinas stated that the parents were required to give 24-hour notice prior to visitation that they intended to exercise their visitation with the children. She described the situation thus:

There were a lot of visits where the parents did not -- or did not show up or would cancel last minute and the foster parents would have to load the kids in the car and come. There was also a visit where the parents -- it was a two-hour visit and they left in the middle of the visit and said they couldn't stay for the full visit. So we had to call the foster parents to come and get the kids and so in -- we did request that because there were so many canceled and so many visits just canceled very last minute, that they -- they confirm with me the day before and then confirm with me the morning of to make sure before everybody went over to the -- to the office for the visit.

At the time of trial, Mother and Father had not had a visit with the children in over a month. Salinas stated that out of 30 or 32 weeks of potential visitation with the children, Father attended only two or three visitations and Mother attended five. Mother and Father cancelled visitations for the stated reasons of forgetfulness and work schedules. While Salinas requested pay stubs and identifying information from Mother and Father, they never provided any proof of employment.

Salinas testified that the Department asked the trial court to terminate both Mother's and Father's parental rights. She stated that she believed it was in the best interest of the children to provide the children a safe and stable home environment and that the children need permanency. According to Salinas, the parents were "[n]oncompliant[]" with their service plan, failed to alleviate the Department's concerns regarding their substance abuse, and the children were doing "extremely well" in their foster home and "making a lot of progress."

Michael Quinn testified he was the guardian ad litem for Kyle and Zack. Quinn told the court that he met and observed the children several times and they

8

were "doing great" at their foster home. He stated that when Zack first came into care, his right foot turned in, making it difficult for him to move, but he is doing great now. He described the children's foster family as "loving and warm." Quinn confirmed he observed visitations between the parents and described the following:

> So it's [Kyle], he would typically become upset from the time his foster mother handed him to me and I would carry him to the visit room. He would -- upset, being crying and I would describe it as separation anxiety. In the visit room, that continued to the point of nearly being inconsolable. [Zack] didn't cry. He played with the toys in the visit room and just did what he does. He would have occasional interaction with the mother, but she was typically trying to console [Kyle].

Quinn stated the visits he observed with Father and Kyle "[s]eemed appropriate and caring." Quinn stated that because Kyle was so young when he was removed from his parents, it was not surprising that he did not have any type of bond with them. He testified that Mother and Father had over thirty opportunities to see their children during the pendency of the case, but visited only a few times.

Quinn testified that he was recommending terminating Mother and Father's parental rights because they have not demonstrated a willingness or ability to provide a safe and stable home for the children and have had irregular visitation. He described their attitude as "indifferent[,]" and stated they have not maintained consistent communication with him or the Department. He stated he has tried several times to contact the parents by telephone, email, and text, with very limited results.

9

He admitted, however, that the service plan did not require Mother to maintain contact with him but rather with the Department.

According to Quinn, Kyle was hospitalized in November 2021 with a respiratory disorder and he had one communication where he asked Mother if there was asthma in Kyle's family history, to which Mother responded affirmatively. After that communication, Mother and Father never communicated with Quinn again regarding Kyle's hospitalization. He stated that when he visited the parents' home, although he did not see the interior of the home, he was not sure the home was a safe structure. He stated the house did not appear to be "weathertight," with holes and openings around the roofline; in addition, there was debris in the yard, four dogs were tied up around the property, the porch was missing boards, and the concrete steps were broken. He also testified he had no personal knowledge that there was a danger in returning the children to the parents, just that the parents had not demonstrated an ability to provide a safe and stable home or emotional or physical stability for the children.

No other witnesses testified at trial. At the conclusion of trial, the trial court terminated Mother's and Father's parental rights, finding predicates under 161.001(b)(1) (E), (N), and (O), and that it was in the children's best interest under section 161.001(b)(2). Mother and Father timely filed this appeal.

## Mother's First Issue

In her first issue, Mother argues the trial court's Order of Termination is void because the trial court lost jurisdiction of the case prior to the rendition of such order. Mother contends that under section 263.401(a) of the Family Code, unless the trial on the merits is commenced on or before the first Monday after the anniversary date the court rendered a temporary order to appoint the Department as temporary managing conservator, the suit is automatically dismissed without a court order. Because the trial court did not sign an order extending the case before the statutory anniversary, but waited until 16 days after the date the trial was commenced to sign such order, the trial court's order is void for want of jurisdiction and the entire lawsuit must be dismissed.

Section 263.401 of the Texas Family Code creates an automatic dismissal deadline that generally requires trial courts to dismiss parental rights termination cases within a year (more or less) of the date the trial court authorized the Department to remove a child from a parent's home. Tex. Fam. Code Ann. § 263.401. The reason we refer to the period as a year (more or less) is that the automatic dismissal date allows the trial court to retain jurisdiction of the suit until the first Monday after the first anniversary of the date the trial court rendered the temporary order appointing the Department as Kyle's temporary managing

conservator. *Id*. § 263.401(a). Further, subsection (b) of the statute provides that unless the trial court has commenced a trial by the statutory deadline, the trial court

> may not retain the suit on the court's docket after the [date the trial was scheduled to have commenced] unless the court finds that *extraordinary circumstances* necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child. (emphasis added).

*Id*. § 263.401(b).

On November 6, 2020, the trial court signed its first temporary order giving the Department temporary conservatorship of Kyle. The trial court's docket notes that on October 26, 2021, a hearing was held with all parties present. The clerk's record demonstrates that Father filed a Motion for Continuance and/or Motion for Extension requesting an extension of case under section 263.401 of the Texas Family Code on the same day. Certificates of Service attached to the motion show that counsel served the motion on all counsel of record on October 26, 2021. The trial court then noted on its docket that it had reset this case to November 22, 2021. An Order Granting Extension signed by the trial court was filed with the clerk's office on December 8, 2021. The order shows that the trial court signed it on December 30, 2021. The order contained the following language:

> On October 26, 2021, a hearing was held in this case. On that date, pursuant to Section 263.401(b) of the Texas Family Code, the Court found that extraordinary circumstances necessitate the children the subject of this suit remaining in the temporary managing conservatorship of the Texas Department of Family and Protective

12

Services, (the "Department"), and that continuing the appointment of the Department as temporary managing conservator is in the best interest of the child.

Therefore, **IT IS ORDERED** that the Department shall remain the temporary managing conservator of the children subject of this suit and that this Order shall be in addition to any and all previous orders made by this Court. The Court orders and sets the following new dates for this matter in accordance with the law:

The new dismissal date is:                                        May 7, 2022
The next pretrial hearing is:        November 22, 2021 at 10:00 a.m.

Mother argues that the trial court lost jurisdiction because the order extending the deadline was not signed until after the statutory dismissal date of November 8, 2021. The Texas Supreme Court has addressed this issue in a recent case, *In re G.X.H.* 627 S.W.3d 288 (Tex. 2021). The Supreme Court explained that Section 263.401(b) does not require the trial court to file the order granting the extension before the dismissal date. The Court stated:

> [The parents] also argue the extension was invalid because the trial court failed to enter an order setting a new dismissal date and trial date before the initial dismissal date passed. We disagree. The last sentence of section 263.401(b) requires the court to render an order that contains a new dismissal date and trial date and makes further temporary orders for the safety and welfare of the children "as necessary" to avoid further delay. But there is no requirement in the statute that this order be rendered before the initial dismissal date.

> The requirements the trial court must satisfy are those expressly written in the statute. And the trial court has satisfied them in this case. It specified the new trial date—October 17—in its August 29 docket entry. It made no further temporary orders, but those are not required in every case. Rather, section 263.401(b) requires further temporary orders only "as necessary to avoid further delay," and neither parent

13

complains of their absence here. Finally, the trial court specified the new dismissal date in its October 30 order. Although the parents contend the trial court was required to reset the dismissal date in writing *before* the September 24 dismissal date, nothing in section 263.401(b) requires this. The final sentence of section 263.401(b) merely requires the court to issue an order addressing these three matters "[i]f the court retains the suit on the court's docket." (emphasis original)

*Id.* at 300-301 (internal citations omitted). As such, Mother's argument that the judgment is void because the trial court signed the order after the dismissal date of November 8, 2021 fails for lack of merit.

Mother also argues the order is void because the order granting the extension fails to strictly follow the guidelines set out in 263.401(b). Tex. Fam. Code § 263.401(b). Section 263.401(b) requires the trial court to include the following in its order granting extension:

If the court retains the suit on the court's docket, the court shall render an order in which the court:

(1) schedules the new date on which the suit will be automatically dismissed if the trial on the merits has not commenced, which date must be not later than the 180th day after the time described by Subsection (a);

(2) makes further temporary orders for the safety and welfare of the child as necessary to avoid further delay in resolving the suit; and

(3) sets the trial on the merits on a date not later than the date specified under Subdivision (1).

*Id.*

14

The omitted findings Mother argues the trial court should have made—a finding focusing on the needs of the children rather than the needs of the court—concern complaints raised for the first time on appeal that Mother failed to properly preserve for our review. Tex. R. App. P. 33.1. As to Mother's argument that the trial court omitted necessary findings from its order, the Texas Supreme Court has explained: "[C]omplaints regarding the trial court's compliance with the requirements in subsection (b) must be preserved for appellate review." *In re G.X.H.*, 627 S.W.3d at 301.Therefore, we conclude Mother failed to preserve any complaint that the trial court failed to provide specific findings addressing the children's needs to explain why extraordinary circumstances justified an extension of the dismissal deadline. Because Mother's arguments were not properly preserved for our review, the issue is overruled.

## Mother's Second, Third, and Fourth Issue and Father's First, Second and Third Issue

In Mother's second, third and fourth issues and Father's first, second, and third issues, they argue that evidence is not legally or factually sufficient to support termination under section 161.001(b)(1)(E), (N), and (O). Texas Family Code Ann. § 161.001(b)(1)(E), (N), (O).

### Standard of Review

In a case terminating the relationship between a parent and a child, the Department must prove that at least one of the statutory grounds for terminating the

relationship exists and that terminating the relationship is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(1), (2). Both the evidence presented to establish the grounds for termination and the best-interest finding must be proven by clear and convincing evidence. *Id.* § 161.001(b)(1); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Clear and convincing evidence is the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007.

When, as here, the parent appeals complaining that there is insufficient evidence to support the trial court's conduct endangerment or its condition endangerment findings, we review the evidence admitted during the trial and determine whether it allowed the trial court, acting as a reasonable factfinder, to form a firm belief or conviction the parent endangered the child. *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (holding that in an appeal, the reviewing court must review the parent's issues that complain about the conduct endangerment and condition endangerment findings based on the parent's right to due process). In our review, we examine "the evidence in the light most favorable to the [trial court's] finding to determine whether [the court, acting reasonably,] could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In deciding whether the evidence supports the findings challenged in an appeal, we consider whether the inferences the trial court drew from the evidence are

16

"reasonable and logical." *In re E.N.C.*, 384 S.W.3d 796, 804 (Tex. 2012). And since the trial court, acting as a factfinder, may reasonably infer facts from proof of other facts if those inferences are also reasonable, we must assume "the factfinder resolved disputed facts in favor of its finding" for any findings it could reasonably infer from the facts proven in the trial. *In re J.F.C.*, 96 S.W.3d at 266.

Because we assume the trial court made all findings required that match its verdict, we "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id*. Even though we disregard the evidence that a trial court could reasonably disbelieve, we do not disregard it when examining the record to see whether it is sufficient to support the findings the trial court made when terminating a parent's rights. *Id*. Instead, when conducting a legal-sufficiency review, we examine all the evidence and determine whether the record shows a reasonable factfinder could have terminated the parent's relationship with her child after considering the evidence that favors the trial court's findings and the evidence the factfinder could not have reasonably disregarded or ignored even though that evidence might have favored another ruling. *Id*.

Mother and Father also argue the evidence is factually insufficient to support the trial court's judgment. In conducting a factual sufficiency review, we determine whether the evidence admitted at trial allowed a reasonable factfinder to form a firm belief or conviction that the facts the Department needed to prove to prevail are true.

*Id*. In our review, we credit all evidence favoring the Department on the claims on which it prevailed at trial if the evidence that supports that claim is clear and convincing. *Id*. But we also consider any evidence admitted during the trial that is contrary to the factfinder's verdict to decide whether the factfinder, in face of the conflicting evidence, could have resolved the dispute in the Department's favor. *Id*. If the factfinder could not have formed a firm belief or conviction that the Department's claims were true in light of all the evidence admitted in the trial, we will find the evidence insufficient to support the verdict, declare the verdict unsupported by clear and convincing evidence, and order a new trial. *Id*.

For convenience, we address Mother's second issue and Father's first issue challenging the trial court's subsection E finding before we address their other issues. According to both parents, the record from the trial contains insufficient evidence to support the trial court's subsection E finding.

Under subsection E, the Department had the burden to prove by clear and convincing evidence that (1) that Mother and Father placed Kyle and Zack with a person or persons who engaged in conduct that endangered their physical or emotional well-being, or (2) Mother and Father engaged in conduct that endangered Kyle and Zack's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Thus, while subsection E focuses on the parent's conduct, it

allows the trial court to include the parent's knowledge about the conduct of others when that person's conduct endangered the child.

In deciding whether factually sufficient evidence supports the trial court's subsection E finding in this case, we focus on whether the evidence established Mother and Father endangered Kyle and Zack's well-being as a "direct result of [their] conduct, including acts, omissions, or failures to act." *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). As the factfinder, the trial court had the right to consider Mother's and Father's direct and indirect conduct to decide whether Mother and Father acted knowingly by exposing Kyle and Zack to loss, to injury, or to circumstances jeopardizing their emotional or their physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

In most cases, the record must contain sufficient evidence to establish the parent engaged in a voluntary, deliberate, and conscious course of conduct. *In re J.T.G.,* 121 S.W.3d at 125. In deciding the case, the trier of fact can consider the actions and the inactions of a parent when evaluating whether the parent's conduct affected the children's well-being. *In re S.M.*, 389 S.W.3d 483, 491-92 (Tex. App.— El Paso 2012, no pet.). And the court can rely on evidence of acts or omissions before and after the children, the subjects of the proceedings, were born. *Id*. Thus, "[w]hile endangerment often involves physical endangerment, the statute does not require

19

that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone." *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). Generally, evidence showing a parent engaged in conduct that created a life of uncertainty and instability for the children is the type of evidence that will support an inference that the parent's conduct endangered the children. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

**Mother - Section 161.001(b)(1)(E)**

The trial court heard evidence regarding Mother's drug use, that she appeared to be under the influence when she arrived at the hospital, that she tested positive for drugs, and Kyle tested positive for amphetamines when he was born, leading to the removal of Kyle. The caseworker testified that although Mother was ordered to undergo drug testing at least once a month during the pendency of this case, she completed only three drug tests during that time. There was also testimony about Mother's inability to provide proof of stable, safe housing and proof of employment. When Zack was removed from Mother's care, Mother claimed she was living in a hotel, but could not provide that hotel's information. Pictures of the home where Mother purportedly was living at time of trial showed a structure that appeared to be in a state of extreme disrepair; both the caseworker and guardian ad litem testified that the structure appeared to be an unfit home for young children. Neither Mother

nor Father offered testimony to rebut these statements, and the caseworker testified that Mother and Father did not send any photographs or give any information regarding the interior of the home. The caseworker also testified that Mother claimed she was employed but never provided pay stubs or other information about her employment. There was also testimony that Mother failed to visit her children, although she had over thirty opportunities to visit. When she did visit, the testimony was that there did not appear to be any bond between Mother and the children. Mother's drug use, inconsistent communication, minimal visitation, missed drug tests, and housing and employment instability prior to and during the case create a course of conduct from which the factfinder could have determined Mother endangered Kyle and Zack's emotional and physical well-being as contemplated by the statute. *See In re C.R.*. 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.) ("The trial court could reasonably infer [Mother] avoided taking the drug tests because she was using drugs."); *In re J.A.V.*, 632 S.W.3d 121, 131 (Tex. App.—El Paso 2021, no pet.) ("testimony regarding continued drug use, coupled with Child's at-birth addiction to opiates as the result of Mother's use of illegal drugs during pregnancy, would further bolster an inference that Mother's drug use continued to endanger Child by affecting Mother's ability to parent."); *In re R.M.*, No. 12-21-00099-CV, 2021 WL 4898460, at *4 (Tex. App.—Tyler Oct. 20, 2021, pet. denied) (mem. op.) ("A parent's drug use both before and after a child's birth is relevant to

21

the issue of endangerment."); *In re A.J.F.*, No. 07-20-00242-CV, 2021 WL 423442, at *4 (Tex. App.—Amarillo Feb. 4, 2021, no pet.) (mem. op.) (concluding a parent's drug use and poor communication with the Department was sufficient evidence of endangerment under subsection E); *In re J.H.*, No. 07-17-00307-CV, 2017 WL 6459537, at *4 (Tex. App.—Amarillo Dec. 11, 2017, pet. denied) (mem. op.) (noting a parent's failure to complete their service plan can be considered in an endangerment finding, including failing to provide proof of employment, pay stub and providing safe and stable housing); *In re E.C.*, No. 07-21-00204-CV, 2022 WL 663279, at *2 (Tex. App.—Amarillo Mar. 4, 2022, pet. denied) (mem. op.) ("inconsistent visitation with a child can emotionally endanger a child's well-being under subsection (E)."); *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009) ("evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices").

**Father - Section 161.001(b)(1)(E)**

Evidence at trial demonstrated that Father was aware of Mother's drug use when she gave birth to Kyle, that he stated she was not in a good home environment, and that Mother had a made a mistake in using illegal drugs shortly before giving birth to Kyle. Evidence as to Father demonstrated that Father failed to visit Kyle while Kyle was in NICU for several weeks, and Father did not provide the hospital with reliable contact information. Similar to Mother, after Kyle was placed in his

foster home, Father also failed to appear for drug testing on several occasions, to maintain contact with the Department, or to submit information or pay stubs regarding his employment. Testimony also showed that Father attended only three out of thirty visitations with his child. Both parents live together in the same house, and testimony from the case worker and guardian ad litem demonstrates that Father failed to provide safe and stable housing; photographs admitted at trial support this testimony.

Reviewing all the evidence in the light most favorable to the termination findings under subsection E, we hold the trial court could reasonably have formed a firm belief or conviction that Mother and Father, through their acts or omissions, endangered their children's physical or emotional well-being. Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's and Father's parental rights was warranted under subsection E. We conclude the Department established, by clear and convincing evidence, that Mother and Father committed the predicate act enumerated in section 161.001(b)(1)(E).

Having concluded that the evidence is legally and factually sufficient to support the trial court's finding of endangerment under section 161.001(b)(1)(E), we need not discuss Mother's or Father's challenge to the court's findings under sections 161.001(b)(1)(N) and (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

23

We overrule Mother's second, third and fourth issues, and Father's first, second, and third issues.

## Mother's Fifth Issue and Father's Fourth Issue

**Best Interest**

In Mother's fifth issue and in Father's fourth issue, Mother and Father challenge the sufficiency of the evidence to support the trial court's finding that termination of their parental rights is in their children's best interest. Tex. Fam. Code Ann. § 161.001(b)(2).

In reviewing whether termination is in a child's best interest, we consider a non-exhaustive list of factors: (1) desires of the child; (2) emotional and physical needs of the child now and in the future; (3) emotional and physical danger to the child now and in the future; (4) parental abilities of the individuals seeking custody; (5) programs available to assist these individuals to promote the best interest of the child; (6) plans for the child by these individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). "[T]he prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest." *In re F.A.B.*, No. 05-

24

14-01277-CV, 2015 WL 631165, at \*3 (Tex. App.—Dallas Feb. 13, 2015, pet. denied) (mem. op.) (citing Tex. Fam. Code Ann. § 263.307(a)).

The list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *Holley,* 544 S.W.2d at 372. However, the best-interest determination neither requires proof of any unique set of factors nor limits proof to any specific factors. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (citing *Holley*, 544 S.W.2d at 371–72). There is no requirement that the party seeking termination prove all nine factors. *See In re C.H.,* 89 S.W.3d 17, 27 (Tex. 2002). "While no one factor is controlling, analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the best interest of the child." *In re R.J.*, 568 S.W.3d 734, 751 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (citations omitted). An appellate court need address only the *Holley* factors that are relevant to the evidence presented. *See In re J.D.*, No. 06-18-00105-CV, 2019 WL 1302932, at \*8 (Tex. App.—Texarkana Mar. 22, 2019, no pet.) (mem. op.). "[I]n conducting the best-interest analysis, a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence." *In re R.J.*, 568 S.W.3d at 751-52 (citation omitted). A jury can give "'great weight' to the 'significant factor' of drug-related conduct." *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.) (quoting *Dupree*

*v. Tex. Dep't of Protective and Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ)).

**Mother and Father**

Testimony at trial established that Mother and Kyle both tested positive for methamphetamine when Kyle was born, leading to Kyle's removal from Mother's custody. Despite Mother and Father completing some portions of their service plan, they failed to maintain consistent communication with the Department, failed to submit to regular drug tests, failed to provide proof of employment, and failed to maintain safe, stable housing.

During the case's pendency, when Mother knew her proper conduct was imperative to regaining possession of her children, Mother failed to get drug tested more than a handful of times. Mother's continued failure to demonstrate she was drug free and her failed attempts to follow her service plan's requirements provides strong evidence that terminating Mother's parental rights is in the children's best interest. "[Mother] caused the drug-positive birth of [the child][.]…[showing] that termination was in the child's best interest." *In re A.M.*, No. 13-09-00276-CV, 2009 WL 3647370, at *5 (Tex. App.—Corpus Christi-Edinburg Nov. 5, 2009, no pet.) mem. op.); *see also In re A.M.L.*, No. 04-19-00422-CV, 2019 WL 6719028, at *4 (Tex. App.—San Antonio Dec. 11, 2019, pet. denied) (mem. op.) (explaining that a parent's drug use "is relevant to multiple *Holley* factors, including [the child's]

emotional and physical needs now and in the future, the emotional and physical danger to [the child] now and in the future, [the parent's] parental abilities, the stability of [the parent's] home, and the acts or omissions which may indicate an improper parent-child relationship.").

The ability of a parent to provide a safe and stable home environment "is the paramount consideration in assessing the best interest of the children." *In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *18 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (citations omitted). Evidence at trial showed that although Mother and Father were living in the same home since spring 2021, it was not safe for their children. The caseworker and guardian ad litem visited the home and Mother and Father were not at the home. They observed a home that did not appear to be weathertight, with several areas that appeared dangerous, including crumbling steps and holes in the exterior walls. Several dogs were tied up around the property and the yard was littered with debris. Mother and Father did not provide an update on the house, or provide information for any new housing after the visit by the Department, and did not provide details or photographs regarding its interior to rebut the Department's testimony. Additionally, Mother and Father failed to demonstrate that they could provide continued financial stability for the children. The caseworker testified that Mother and Father never provided employer information or pay stubs, despite reporting that they were employed during the

27

pendency of the case. *In re I.L.G.*, 531 S.W.3d 346, 356 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (citation omitted) ("A child's need for permanence through the establishment of a 'stable, permanent home' has been recognized as the paramount consideration in a best-interest determination."); *In re D.M.A.,* No. 04-21-00441-CV, 2022 WL 298983, at *5 (Tex. App.—San Antonio Feb. 2, 2022, no pet.) (citations omitted) (mem. op.) ("[i]nstability in employment and housing also supports the best-interest finding." "'A child's need for permanence through the establishment of a 'stable, permanent home' has been recognized as the paramount consideration in a best-interest determination.'"); *In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *30 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) (citations omitted) ("parent's failure to maintain stable and continuous employment as required by [family service plan] supports termination of parental rights").

There was also evidence regarding Mother's and Father's lack of parental abilities. Testimony showed that when the children entered foster care, Zack had issues with his feet that required physical therapy, and both children attended physical therapy to strengthen their muscles. Testimony also demonstrated that Kyle did not have any kind of bond with Mother and that Mother generally did not interact with Zack during visitation. According to testimony, the few times Father came to visit his children, Father did behave appropriately with the children. Mother and

28

Father attended at most five visitations out of thirty chances to visit their children, so testimony about their interactions with their children was very limited. There was no testimony at trial regarding Mother's or Father's future plans to nurture their children. The only evidence the trial court heard demonstrated Mother's and Father's lack of stable employment and parenting skills, inconsistent visitation, inadequate housing, and general inability to care for their children or provide a safe, stable home environment for them. Additionally, Mother and Father did not complete several drug tests required by the Department. "A parent's inability to provide adequate care for her children, unstable lifestyle, lack of a home and income, lack of parenting skills, and poor judgment may be considered when looking at the children's best interest." *In re J.D.*, 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App—Fort Worth 2003, no pet.)). We also note that while there was limited testimony about any bond between Mother and Father and the children, evidence of a parental bond between parent and child does not "outweigh the significant evidence supporting the finding that termination of [the parent's] parental rights was in the children's best interest" in light of other evidence "that [the parent] did not take advantage of opportunities to visit the children when allowed." *In re D.L.T.*, No. 01-15-00845-CV, 2016 WL 888768, at *8 (Tex. App.—Houston [1st Dist.] Mar. 8, 2016, no pet.) (mem. op.).

At the time of trial, the children were two and one years old, respectively. While they were too young to express their desires, testimony showed that both children's needs were being met in foster care, and they were happy and thriving in their current placements. The testimony was that it was in the children's best interest to terminate Mother's and Father's parental rights because the children deserved a safe and stable environment and permanency. *See In re A.F.R.*, No. 01-20-00355-CV, 2020 WL 6140181, at *11 (Tex. App.—Houston [1st Dist.] Oct. 20, 2020, pet. denied) (mem. op.) (explaining that a "paramount consideration" in the best-interest determination is ensuring that the child is in a "stable, safe, and permanent home").

Our review of the record shows there was clear and convincing evidence that would allow the factfinder to reasonably form a firm belief that termination of Mother's and Father's parental rights is in the children's best interest; both legally and factually sufficient evidence supports the trial court's finding. We overrule Mother's fifth issue and Father's fourth issue on appeal.

**Mother's Sixth Issue**

In her final issue, Mother argues the evidence is legally and factually insufficient to support the appointment of the Department as sole managing conservator of the children. Mother states that the Department was appointed based on the Mother's rights being improperly terminated because of solely conclusory statements from the caseworker and guardian ad litem.

30

"[T]he quantum of proof required to support a termination decision differs from the level necessary to support a conservatorship appointment." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Circumstances could exist where the evidence is insufficient to support termination but still would support the determination that appointment of a parent as conservator would impair the child's physical health or emotional development. *Id.* The level of proof is clear and convincing for terminations. *Id.* (citing Tex. Fam. Code Ann. § 161.001). However, the level of proof for conservatorship appointments is a preponderance-of-the-evidence standard. *Id.* (citing Tex. Fam. Code Ann. § 105.005) (other citation omitted). We review a trial court's decision on conservatorship for an abuse of discretion. *See id.*; *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982).

Here, we cannot say the trial court abused its discretion by appointing the Department as Kyle's and Zack's managing conservator. The record established Mother tested positive for drugs at Kyle's birth. She did not maintain consistent contact with Kyle or the medical staff while Kyle remained in the hospital after his birth, and hospital staff expressed concern about Mother's parental abilities. Before Zack was removed from Mother's care, Mother told the Department she was living with Zack and Father in a hotel but could not provide the name or location of the hotel. She later moved to another town with Zack, and Father's mother watched Zack, although Father's mother had a potentially concerning medical condition.

Mother failed to comply with her service plan, and also failed to submit to required drug tests, maintain consistent communication with the Department, or provide proof of employment or stable, safe housing. Mother further failed to consistently visit her children, although she was afforded many opportunities to visit with them. There was no testimony regarding Mother's plans for her children, where they would live, who would care for the children, or Mother's current sobriety. The evidence also established that Kyle had no significant relationship with Mother, and in the limited visitation Mother had with Kyle and Zack, she spent more time soothing Kyle, rather than interacting with Zack. To the extent Mother contends the evidence was legally and factually insufficient to support the trial court's conservatorship determination, we overrule her final issue.

## Conclusion

Having overruled all of Mother's and Father's issues on appeal, we affirm the judgment of the trial court terminating their parental rights and appointing the Department as sole managing conservator of Kyle and Zack.

AFFRIMED.

_____
CHARLES KREGER
Justice

Submitted on June 13, 2022
Opinion Delivered August 11, 2022
Before Golemon, C.J., Kreger and Johnson, JJ.